**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| SCOTT A. ASHMAN | : | |
| | : | |
| Appellant | : | No. 1068 MDA 2022 |

Appeal from the Judgment of Sentence Entered July 7, 2022,
in the Court of Common Pleas of Huntingdon County,
Criminal Division at No(s):  CP-31-CR-0000199-2021.

BEFORE:  PANELLA, P.J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY KUNSELMAN, J.:        **FILED: JUNE 27, 2023**

Scott A. Ashman appeals the judgment of sentence imposed after a jury found him guilty of several offenses.  Upon review, we affirm.

The trial court detailed the facts in this case:

[Ashman's] convictions and sentences arise from a course of conduct in which he took advantage of T.F., a mentally disabled woman in her early twenties (approximately thirty years younger than [Ashman]) who has an IQ of 67.4.  In 2019 T.F. was living in a group home in Huntingdon Borough, and became friends with [Ashman] on Facebook.  At the time, T.F. was not under a guardianship, and thus she could come and go from the group home as she pleased.  T.F. began spending time with [Ashman], and both T.F. and [Ashman] testified that their relationship became sexual after an incident in which [Ashman] picked T.F. up from the group home in his pickup truck, drove her to a park area known as Flagpole Hill, and T.F. performed oral sex on him.  In the weeks afterward T.F. began spending more and more time at [Ashman's] home, eventually getting kicked out of the group home as a result of her absence from it.  She then moved in with [Ashman].

T.F. lived at [Ashman's] house for about a year. Both T.F. and [Ashman] testified that [he] gave T.F. crystal methamphetamine while she was living at his house, and the two would smoke it together. T.F. generally testified that she and [Ashman] would smoke crystal meth on the couch in [his] home, that [Ashman] would watch pornographic movies with her, and that she would at times take her clothes off and sit around naked because she was "hot." She testified to two more specific sexual incidents between herself and [Ashman], one in which she performed oral sex on him again, and one in which he had intercourse with her. She further testified that [Ashman] penetrated her digitally.

Eventually, because of reports that were being made to authorities, adult protective services became involved in the situation. T.F. was removed from [Ashman's] home by police in January of 2021 and guardianship proceedings were initiated. T.F. was found to be incapacitated and Distinctive Human Services, a guardianship agency, was appointed as guardian of T.F.'s person.

At that time, the full scope of how [Ashman] had taken advantage of T.F. was not known. The facts finally came to light after T.F. had been removed from [Ashman's] direct influence. Nadine Strayer, the Guardian Services Specialist with DHS who [was] assigned to T.F.'s case, testified that DHS first moved T.F. to a group home in Confluence, Pennsylvania, in order to put distance between her and [Ashman]. After T.F. had been in that placement for about a month, Ms. Strayer received a phone call from T.F. T.F. was upset because she felt like she had been lying to Ms. Strayer about what had occurred between [her] and [Ashman]. T.F. also revealed that [Ashman] had continued to send sexual pictures and videos of himself to her via Facebook Messenger, and to ask her to perform sexual favors for him, after she had been removed from his home. Ms. Strayer contacted her supervisor; and together they contacted the Pennsylvania State Police, resulting in the investigation and prosecution of [Ashman].

At trial, T.F. authenticated the messages, and testified as to the content of the videos, that she had shown Ms. Strayer. The videos were of [Ashman's] penis while he was masturbating and ejaculating, and the messages included the following sequence of questions and statements made by [Ashman]:

Am I a sick pervert[?]

Because I like forcing people to suck my dick like I did you grabbing your head[?]

- 2 -

I do like it. I've known that for years.

\*\*\*

On March 16, 2021, [Ashman] appeared at the Huntingdon Station of the Pennsylvania State Police for a voluntary interview with Trooper Robert Colton. During the interview [Ashman] admitted that he knew T.F. was mentally disabled before she moved in with him, that she performed oral sex on him on Flagpole Hill, that it was [he] in the pictures and videos that were sent to T.F., and that he and T.F. had smoked crystal meth together. [Ashman] denied having any sexual encounters with T.F. other than the incident on Flagpole Hill and claimed not to know how the pictures, videos, and messages got sent to T.F. (he blamed this on his drug use). [Ashman] expressed guilt for what had occurred, and referred to himself as "a monster."

Notably, despite all that occurred between them, [Ashman] also testified that he saw himself as a " father figure" for T.F.

Trial Court Opinion, 9/20/22, at 2-4 (citations and some quotations omitted).

Following trial, a jury convicted Ashman of rape, involuntary deviate sexual intercourse ("IDSI"), and aggravated indecent assault of a person, all involving a person with a mental disability.[1] Subsequently, the trial court sentenced Ashman to an aggregate sentence of 187-374 months' incarceration (approximately 15 1/2 to 31 years).

Ashman filed a post-sentence motion seeking judgment of acquittal of his convictions, *inter alia*, which the trial court denied. Ashman filed this timely appeal.

---

[1] 18 Pa.C.S.A. §§ 3121(a)(5), 3123(a)(5), and 3125(a)(6).

- 3 -

Ashman raises a single[2] issue for our review:

1. The [t]rial [c]ourt erred in denying [Ashman's] [m]otion for [a]cquittal, based on the fact, that it is constitutionally impossible for him to be convicted of [rape of a mentally disabled person] . . . IDSI [person with mental disability] . . . and [aggravated indecent assault – complainant suffers mental disability] . . . in light of the Pennsylvania Guardianship Act's statutory provision which allows an incapacitated person to consent to marriage.

Ashman's Brief at 4.

On appeal, Ashman contends that the trial court erred when it denied his motion for judgment of acquittal of his convictions. Ashman's Brief at 4. We consider this issue with the following in mind.

A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge, and is granted only in cases in which the Commonwealth has failed to carry its burden regarding that charge.

The standard of review for claims of insufficient evidence is well-settled. With respect to such claims, we consider the evidence in the light most favorable to the Commonwealth as verdict winner. In that light, we decide if the evidence and all reasonable inferences from that evidence are sufficient to establish the elements of the offense beyond a reasonable doubt. We keep in mind that it was for the trier of fact to determine the weight of the evidence and the credibility of witnesses. The jury was free to believe all, part or none of the evidence. This Court may not weigh the evidence or substitute its judgment for that of the factfinder.

---

[2] We note that in his appellate brief Ashman includes a Pennsylvania Rule of Appellate Procedure 2119(f) statement setting forth the reasons for his appeal to challenge the discretionary aspects of sentence. Although Ashman raised this issue with the trial court, he did not include it as an issue in his statement of questions involved or address it in the argument section of his appellate brief. We therefore will not consider it.

*Commonwealth v. Devries*, 112 A.3d 663, 667 (Pa. Super. 2015) (citations omitted).

A person commits the offense of rape of a mentally disabled person when the person "engages in sexual intercourse with a complainant ... [w]ho suffers from a mental disability[,] which renders the complainant incapable of consent." 18 Pa.C.S.A. § 3121(a)(5).

A person commits the offense of IDSI of a mentally disabled person "when the person engages in deviate sexual intercourse with a complainant . . . who suffers from a mental disability which renders him or her incapable of consent." 18 Pa. C.S.A. § 3123 (a)(5). "Deviate sexual intercourse" includes, in relevant part, "sexual intercourse per os or per anus between human beings and any form of sexual intercourse with an animal." 18 Pa.C.S.A. § 3101.

A person commits the offense of aggravated indecent assault of a mentally disabled person when the person penetrates, however slight, "the genitals or anus of a complainant with a part of the person's body for any purpose other than good faith medical, hygienic or law enforcement procedures commits aggravated indecent assault who suffers from a mental disability which renders him or her incapable of consent" (except as provided in sections 3121 (relating to rape), 3122.1 (relating to statutory sexual assault), 3123 (relating to involuntary deviate sexual intercourse) and 3124.1 (relating to sexual assault)). 18 Pa.C.S.A. § 3125(a)(6).

In claiming that the evidence was insufficient, Ashman maintains that T.F. consented to the sexual acts with him. Specifically, Ashman argues that

there was no evidence "whatsoever" that he forced himself on T.F. Ashman also argues that, under the Pennsylvania Guardianship Act, T.F. as an incapacitated person is allowed to consent to marriage, which ultimately is consummated with sex, without criminal charges; however, because he and T.F. were not married and she was single, she did not have the ability to consent to sexual acts. According to Ashman, this contradiction in the law makes it "constitutionally" impossible for him to be convicted of the foregoing offenses. Ashman's Brief at 15-16. We disagree.

First, the Commonwealth presented evidence that Ashman forced T.F. to do certain acts. After T.F. was removed from Ashman's home, he texted her and said, "Am I a sick pervert[?] Because I like *forcing* people to suck my dick like I did you *grabbing* your head[?]" N.T., 3/15/22, at 45. Ashman admitted to physically forcing T.F. to engage in sex acts with him.

Notwithstanding this, and more importantly, the crimes which Ashman was convicted of do not require a showing of force but rather that the victim is mentally disabled and incapable of consent. Here, the Commonwealth established both regarding T.F.

Mr. Ray, an expert in the field of psychology, tested and evaluated T.F. In fact, he previously had done so in another matter and was familiar with her and her history. Mr. Ray testified that T.F. had diminished cognitive capacity to the point that she qualified for a diagnosis of mild intellectual disability. *Id.* at 85, 88. Mr. Ray also opined within a reasonable degree of psychological certainty that T.F. does not have the capability to consent to sexual acts. He

thoroughly explained the bases for his conclusions and are evident from the record. *Id.* at 94. Ashman's reliance on the Pennsylvania Guardianship Act to negate this evidence and disprove that T.F. could not consent is entirely misplaced.[3]

As noted above, the criminal statutes at issue are concerned with whether the victim "suffers from a mental disability which renders [him or her] incapable of consent" not whether the person is an "incapacitated person" for guardianship purposes. Furthermore, Pennsylvania Guardianship Act does not support Ashman's argument. In relevant part, it provides:

> (d) Powers and duties only granted by court.--Unless specifically included in the guardianship order after specific findings of fact or otherwise ordered after a subsequent hearing with specific findings of fact, a guardian or emergency guardian shall not have the power and duty to:
>
> ***
>
> (2) Prohibit the marriage or consent to the divorce of the incapacitated person.

20 Pa.C.S.A. § 5521(d). As the trial court aptly explained:

> That provision does not, as proffered by [Ashman], "allow an incapacitated person to consent to marriage." Rather, it limits the powers of the guardian of an incapacitated person, in that a

_____

[3] Initially, we observe, as the trial court did, that Ashman does not make any real constitutional argument or explain how this is a constitutional issue except to characterize this claim as being a constitutional one. He does not cite any provision of our federal or state constitutions as a basis for it. Instead, he argues that the criminal statutes under which he was convicted conflict with the Pennsylvania Guardianship Act, which allows an incapacitated person to consent to marriage and ultimately sex.

guardian cannot "[p]rohibit the marriage [of] or consent to the divorce of the incapacitated person" without a prior order of court.

Further, a court cannot enter such an order until after it holds a hearing on the issue and makes specific findings of fact in support thereof. . . .

This interpretation of the effect of § 5521(d)(2)—that it does not establish a right for incapacitated persons, but rather serves to limit the authority guardians [have] over them--makes perfect sense. The entire purpose of Chapter 55 is not to grant enumerated rights to incapacitated persons, but rather to establish a structure by which the welfare of incapacitated persons may be protected and under which their inherent rights as citizens may be limited in order to accomplish that goal, all while employing the least restrictive alternatives available.

Trial Court Opinion, 9/20/22, at 9; *see generally*, 20 Pa.C.S.A. § 5502.

Furthermore, as the trial court observed, an incapacitated person's ability to consent to marriage is not unfettered. Trial Court Opinion, 9/20/22, at 10. In Pennsylvania, individuals must obtain a license to get married, and the issuance of such licenses may be restricted:

No marriage license may be issued if either of the applicants for a license is weak minded, insane, of unsound mind or is under guardianship as a person of unsound mind unless the court decides that it is for the best interest of the applicant and the general public to issue the license and authorizes the issuance of the license.

See 23 Pa. C.S. §§ 1301(a) (marriage license required) and 1304(c) (limits on issuance of marriage licenses to "incompetent persons"). Thus, incapacitated persons can only consent to marriage if they have prior approval from a court empowering them to do so. Otherwise, they cannot get married.

Viewing the evidence in the light most favorable to the Commonwealth,

- 8 -

we conclude that the evidence was sufficient to sustain Ashman's convictions. Furthermore, Ashman's attempt to use the Pennsylvania Guardianship Act to demonstrate that T.F., an incapacitated person under guardianship, was capable of consenting to sexual acts with him fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 06/27/2023